UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

                                                    :
MEDIACAP PARTNERS, LLC,                             :
                                                    :
                              Plaintiff,            :
                                                    :          25-cv-7129 (LJL)
            -v-                                     :
                                                    :          OPINION AND ORDER
SCREENVISION DIRECT, INC.,                          :
                                                    :
                              Defendant.            :
                                                    :
--------------------------------------------------------------------- X

LEWIS J. LIMAN, United States District Judge:

MediaCap Partners, LLC ("MediaCap") brings suit against Screenvision Direct, Inc.

("Screenvision") for breach of contract, anticipatory breach, declaratory judgment, and breach of

the covenant of good faith and fair dealing arising out of a Strategic Relationship Agreement

between the parties.  MediaCap alleges that it is due payments under the agreement that

Screenvision has refused to pay.  Screenvision has moved to dismiss the complaint in full.  For

the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

The Court accepts the well-pleaded allegations in the Amended Complaint as true for the

purposes of this motion only.

MediaCap is alleged to be a strategic consultant in the media, marketing, content, and

technology services space.  Dkt. No. 18 (the "AC") ¶ 3.  It is a Delaware limited liability

company with a principal place of business in Georgia.  *Id.* ¶ 5.  Its sole member is Jason Dolan,

who is a resident of Georgia.  *Id.* ¶ 6.  Screenvision is a cinema advertising company that

delivers on-screen and lobby advertisements across movie theaters throughout the United States.

*Id.* ¶ 6.  It is a New York corporation with a principal place of business in New York.  *Id.* ¶ 7.

MediaCap alleges that Screenvision approached MediaCap about forming a strategic relationship in late 2024 with the goal of bolstering its revenue in the fourth quarter of that year. *Id.* ¶ 14.  MediaCap accordingly ordered $10,150,000 in advertising inventory across the Screenvision network but was not required to pay for it at that time.  *Id.* ¶ 16.  The advertisements ordered ran through the remainder of 2024.  *Id.*  Under the accrual-basis method of accounting followed by it, Screenvision recognized $10 million of revenue even though payment had not been received, thereby strengthening its financial position—a practice alleged to be common in the media industry and at Screenvision.  *Id.* ¶¶ 17–18.

In February 2025, the two companies signed a Strategic Relationship Agreement (the "SRA"), backdated to be effective as of October 1, 2024.  The SRA recited that MediaCap had ordered $10,150,000 of advertising inventory across the Screenvision Network (defined as the "Initial Company Inventory") and had been granted the "rights" to an additional $25,400,000 in advertising inventory to be used in accordance with a pacing schedule (defined as the "Further Company Inventory").  *Id.* ¶¶ 19–22; *see* Dkt. No. 18-1 (the SRA) at 2.[1]  Together, the Initial Company Inventory and the Further Company Inventory were defined in the SRA as the "Company Inventory."  *Id.* at 2.  The SRA also recited that "upon the grant of the Further Company Inventory," MediaCap "shall, as part of a joint means to enhance Screenvision's sales conversion efforts (collectively, 'Joint Efforts'), have the right to work with Screenvision's senior management to create new or otherwise grow, maintain, or otherwise enhance Screenvision's relationships with new or existing advertisers and agencies, to sell, transfer, assign, or otherwise dispose of its right to Company Inventory and/or Production Services to Company Clients per the Pacing ('Joint Efforts Inventory')."  *Id.* at 2–3.  The SRA further

---

[1] Unless otherwise noted, citations refer to ECF pagination.

recited that "to best enhance the value and speed of the use of the Company Inventory, it is contemplated that Screenvision may, upon [MediaCap's] notice and request . . . be engaged by [MediaCap] to serve as [MediaCap]'s sales representative to sell such designated Further Company Inventory to entities other than Company Clients (and upon such agreed designation, shall have the obligation to sell the assigned Company Inventory" and that, in the event it was so engaged, it would be paid a commission (the "Screenvision Commnission"). *Id.* at 3.[2] Thus, by its terms, the recitals gave rights to MediaCap but did not impose obligations on it—rather, the recitations discuss only that it had the "right" to work with Screenvision on the Joint Efforts.

In a section entitled "Commitment to Purchase," the parties agreed that MediaCap would be "deemed to have an obligation to engage in Joint Efforts with Screenvision" to sell or use the Further Company Inventory (the $25,400,000 in inventory granted to MediaCap) "per the Pacing schedule set forth in Exhibit A." *Id.* § 2(a). The SRA attached to the AC leaves a blank for Exhibit A with the notation "[To Be Agreed By The Parties]," *id.* at 10, but Plaintiff attaches an exhibit that purports to reflect the pacing set forth in the SRA, Dkt. No. 18-2 ¶ 3. That addendum contains certain dollar values to be hit in each quarter from 2025 through 2027, and notes that "upon request, Screenvision may accelerate the pacing of the use [sic] [MediaCap's] inventory." *Id* at 2.

The SRA obligated MediaCap, "in connection with the Joint Efforts Inventory then remaining," and "[a]t Screenvision's request," to "advise Screenvision on Screenvision's product roadmap, offerings, selling strategies and/or other marketing strategies, pricing strategies, and materials associated [sic] Screenvision initiatives and, when agreed and deemed advisable by the

---

[2] The parties agreed that the recitals were incorporated into the SRA and were binding. SRA at 3 ¶ 1(a).

Parties, attend such meetings with existing and prospective clients . . . in connection with the Joint Efforts." *Id.* § 3(a). In other words, if MediaCap exercised its right to work with Screenvision's senior management to grow Screenvision's relationships with new or existing advertisers and agencies (*i.e.*, the "Joint Efforts Inventory"), MediaCap would have to provide advice to Screenvision at Screenvision's request. The SRA is silent with respect to any obligations of MediaCap in the event that it did not exercise such right to sell to Screenvision's clients. And to "incentivize" sales (particularly in connection with the Joint Efforts), the parties agreed that each time payment was made to MediaCap "in connection with a single advertiser's use of Further Company Inventory that is at least $1,000,000," MediaCap would provide Screenvision with "entertainment benefits," which could be waived by Screenvision at its discretion *Id.* § 3(b). The exact nature of the entertainment benefits to be provided would be "as mutually agreed by the parties at the time of utilization." *Id.*

MediaCap could also, "at its sole and exclusive discretion," request that Screenvision be assigned as its "sole and exclusive sales representative in connection with designated previously purchased/committed/granted Company Inventory, and upon Screenvision's acceptance of such assignment . . . shall be deemed to be the 'Accepted Sales Inventory.'" *Id.* § 4(a). MediaCap's request for such assignment could not be "unreasonably withheld, conditioned, or delayed" by Screenvision. *Id.* The Joint Efforts Inventory and Accepted Sales Inventory collectively were defined as the "SV Sales Inventory." *Id.* Screenvision agreed to "sell such SV Sales Inventory to a credit-worthy third party at an amount that is no less than the Net Media Cost of the SV Sales inventory." *Id.* § 4(b). If MediaCap elected to have Screenvision act as its sole and exclusive sales representative, the SRA commits to the "sole, exclusive, and unfettered discretion" of Screenvision the (i) selection of which third parties are eligible to purchase the SV

4

Sales Inventory; (ii) how they contract for the purchase thereof; (iii) how that SV Sales Inventory is delivered; and (iv) how the third parties are invoiced.  *Id.*

The concept of the Net Media Cost is important in the SRA.  Section 4(b) of the SRA states:

> For purposes of this Agreement, (i) the term "**Net Media Cost**" means the actual media costs as determined at the rate negotiated and/or ordered by Screenvision's customers on contracts/orders with Screenvision for advertising placements relating to SV Sales Inventory (inclusive of pricing, schedules, guarantees (if any), demographics, discounts, and other performance metrics); and (ii) the Net Media Cost for the SV Sales Inventory is agreed to be an amount that is no less than the value stated for the Company Inventory that was assigned to Screenvision as SV Inventory.

SRA § 4(b).  Screenvision agreed that, upon "such resale of SV Sales Inventory by Screenvision to a third party" "the New Media Cost will be paid to [MediaCap] within the payment terms set forth herein, less the Screenvision compensation of 25% of Net Media Costs in connection with its service as the Company's sales representative," defined as the "Screenvision Commission."  *Id.*

The next subsection of the SRA details payments that Screenvision would make to MediaCap.  It provides in pertinent part as follows:

> Unless otherwise agreed by the Parties, in advance and in writing (and subject to the limited right of set-off stated in the paragraph that follows), Screenvision agrees to pay [MediaCap] on a quarterly basis via ACH or wire transfers the greater amount of either (i) the Net Media Cost of the SV Sales Inventory resold by Screenvision during a particular broadcast quarter (less Screenvision Commission), or (ii) the amount that is equal to the Net Media Cost of the SV Sales Inventory assigned to Screenvision for use in the prior quarter, less the Screenvision Commission.

*Id.* § 4(c).  Each payment was to be made by Screenvision on or prior to the first of the first month of the then active quarter.  *Id.*

Section 4(d) gave Screenvision the right to set off those quarterly payments to MediaCap by the amount due from MediaCap for the initial $10 million order. *Id.* § 4(d). The setoff was "up to a maximum of 50% of the amount that would otherwise be due from Screenvision to [MediaCap] as a Company Payment in accordance with Section 4(c)." *Id.* Once that balance was zero, "Screenvision shall make all other payments with respect to the resale of SV Sales Inventory to [MediaCap], without any right to set-off or counterclaim." *Id.*

Screenvision agreed to certain obligations as sales representative, including that it would "provide and maintain, at its own expense, a competent and adequately trained, skilled, and motivated sales organization for the solicitation and sale of SV Sales Inventory to Screenvision's customers," and that upon MediaCap's "reasonable request," it would provide "sales reports setting forth the amount of SV Sales Inventory sold during the period requested." *Id.* § 5. Screenvision agreed that until it paid MediaCap for the SV Sales Inventory, it would keep all funds that were paid by Screenvision's customers for MediaCap's benefit. *Id.* § 4(b).

On February 24, 2025, MediaCap assigned the entire $25,400,000 million of Further Company Inventory to Screenvision. AC ¶ 27. Shortly before the first quarterly payment was due on April 1, 2025, however, Screenvision asked MediaCap to defer its obligations to the second quarter, in which Screenvision would be able "to do $3 million instead of $2 million." *Id.* ¶ 38. MediaCap agreed on the basis that the Screenvision's first-quarter set off rights would be adjusted accordingly. *Id.* ¶ 39; Dkt. No. 18-2. Plaintiff has attached the addendum as an exhibit to the complaint and includes the amended pacing schedule as a chart within the body of the complaint *Id.* ¶ 42; Dkt. No. 18-2. That chart clarifies that the first payment of $375,000

6

would be paid by Screenvision to MediaCap on July 1, 2025—that consisted of $2,000,000 per the pacing agreement, offset by $500,000 in commission and $1,125,000 in set off from the initial investment that would be retained by Screenvision, yielding a figure of $375,000 which was described as "Payment by Screenvision to Mediacap." *Id.*[3]

On June 30, 2025, Screenvision stated that "no creditable new sales have come in through MediaCap," such that "there isn't a basis for Mediacap to ask Screenvision to pay a payment under the agreement." AC ¶ 46; Dkt. No. 18-8. MediaCap responded that the payment obligations were not contingent on "new sales" "creditable" to MediaCap. *Id.* Screenvision did not make the payment requested by MediaCap on July 1. AC ¶ 48. On July 10, counsel for Screenvision stated again that it did not owe any payment to MediaCap and asserted instead that MediaCap owed money to Screenvision for the initial inventory. *Id.* ¶ 49.

MediaCap alleges that it fully complied with its obligations under the SRA, including its Joint Efforts obligations, by participating in meetings, preparing presentations, preparing analyses, and conducting research, among other things. *Id.* ¶¶ 34–35. These tasks were primarily performed by MediaCap's consultant, Damon Pierson, a recognized leader in the media industry. *Id.* ¶ 36.

MediaCap alleges that according to the payment formula outlined in the SRA, it is now owed $9,025,000—made up of the $25,400,000 in further company inventory, less a set off for the $10,500,000 from the initial investment, and less a $6,350,000 payment due to Screenvision as commission. AC ¶ 32.

---

[3] At oral argument, the parties were unable to explain how the math with respect to the pacing schedule aligned with the terms of the SRA.

**PROCEDURAL HISTORY**

This suit was initiated by complaint on August 27, 2025. Dkt. No. 1. Defendant submitted a motion to dismiss the complaint and an accompanying memorandum of law on October 13, 2025. Dkt. Nos. 13–14. Plaintiff then submitted an amended complaint on November 3, 2025. Dkt. No. 18.[4] Defendant again moved to dismiss the Amended Complaint, along with a memorandum of law, on December 9, 2025. Dkt. Nos. 22–23. Plaintiff submitted a memorandum of law in opposition, Dkt. No. 32, to which Defendant replied, Dkt. No. 33.

On December 10, the Defendant moved to stay discovery pending adjudication of the motion to dismiss. Dkt. No. 24. The Court took it under advisement at that time, Dkt. No. 27, later granting it on March 4, 2026, Dkt. No. 36. The Court held oral argument on the motion to dismiss on April 14, 2026. *See* Apr. 14, 2026 Minute Entry.

**LEGAL STANDARD**

On a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether a "claim has facial plausibility,"

---

[4] In light of the Amended Complaint, Screenvision's original motion to dismiss is denied as moot.

which is established where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the claim. *Twombly*, 550 U.S. at 556; *see Mattrixx Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

At the motion to dismiss stage, the Court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Where, as here, the Plaintiff has attached the contract that forms the basis of the action, if the contract's plain language contradicts the allegations of the complaint, it is the clear language of the contract that prevails. *See Karmilowicz v. Hartford Fin. Servs. Grp.*, 494 F. App'x 153, 156 (2d Cir. 2012) (summary order).

## DISCUSSION

MediaCap alleges four different counts against Screenvision for breach of contract, anticipatory breach, declaratory judgment, and breach of the implied covenant of good faith and fair dealing. Dkt. No. 18. Screenvision moves to dismiss each for failure to state a claim. Dkt. No. 22. Jurisdiction is appropriate under 28 U.S.C. § 1332, as Plaintiff is a Delaware LLC with a sole member citizen of Georgia, and Screenvision is a New York corporation with its principal place of business in New York. AC ¶¶ 4–7. The Court applies the law of the forum state, New York, to Plaintiff's claims. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The SRA contains a choice of law provision, stating that it shall be "construed in accordance with the laws of the State of New York applicable to contracts made and to be fully performed therein." SRA

§ 6(d).  "New York law favors the enforcement of forum selection clauses."  *Siddiqui v. Athene Holdings Ltd.*, 806 F. App'x 50, 52 (2d Cir. 2020) (summary order).  Neither party argues that any other state's law should be applied, and both brief the contractual claims under New York law.  Accordingly, New York law applies to the breach of contract, anticipatory breach, and breach of the covenant of good faith and fair dealing claims.

Before addressing the merits of the motion to dismiss, the Court first addresses Count III, for declaratory judgment.  In its opposition to the motion to dismiss, MediaCap does not respond to Screenvision's argument that its request for declaratory judgment must be dismissed as duplicative.  "It is well settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claim."  *McGee v. McGready*, 2019 WL 6341290, at *3 n.4 (S.D.N.Y. Nov. 26, 2019) (citing *Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018) (summary order)).  In any event, the declaratory judgment count, which seeks a declaration that there was a breach of contract and that MediaCap is entitled to damages, AC ¶¶ 66–68, is entirely duplicative of MediaCap's breach of contract claims.  "The law is clear that a request for declaratory judgment must be dismissed if it is merely duplicative of a plaintiff's breach of contract claim."  *WM Bang LLC v. Travelers Casualty Ins. Co. of Am.*, 559 F. Supp. 3d 225, 234 n.2 (S.D.N.Y. 2021) (quoting *NRW, Inc. v. Bindra*, 2015 WL 3763852, at *3 (S.D.N.Y. June 16, 2025)).  Count III is therefore dismissed with prejudice.

## I.    Breach of Contract

Screenvision first moves to dismiss MediaCap's claim for breach of the SRA.  MediaCap alleges that under the SRA, Screenvision was required to make a $375,000 payment to MediaCap on July 1, 2025, and that it was required to make a further $1,125,000 payment to MediaCap on October 1, 2025, but that it made neither payment.  AC ¶¶ 56–58.  MediaCap

10

states that it "fully performed all duties and obligations under the SRA." *Id.* ¶ 59. "As a direct and proximate result of Screenvision's breach of the SRA, MediaCap has suffered damages as of the date hereof in an amount of $1,500,000." *Id.* ¶ 61.

"Under New York law, 'there are four elements to a breach of contract claim: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Zim Am. Integrated Shipping Servs. Co., LLC v. Sportswear Grp., LLC*, 550 F. Supp. 3d 57, 65 (S.D.N.Y. 2021) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)). Neither party to this action contests that the SRA is a valid agreement between the parties. In addition, the SRA is express that it "contains the entire agreement between the parties and supersedes all prior or contemporaneous agreements, discussions or representations, oral or written with respect to the subject matter hereof." SRA at 9. "New York law is well settled that industry practice may not be used to vary the terms of such a contract." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014); *see Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1166 (2d Cir. 2024).

In their briefing on the motion to dismiss, the parties also rely on several addenda to the SRA. *See* Dkt. Nos. 18-2, 18-3, 18-4. For purposes of the motion to dismiss, the Court considers those addenda as part of the integrated agreement. The SRA itself expressly contemplates the attachment of a Pacing Schedule at Exhibit A, which it explains is "to be agreed by the parties." SRA at 10; *see also id.* at 2 (incorporating the pacing schedule "by reference.") "When a contract 'annexes' as an essential part the terms of another instrument, the other instrument is deemed part of the contract." *NLRB v. Vanguard Tours, Inc.*, 981 F.2d 62 (2d Cir. 1992). MediaCap alleges that the parties "agreed on the amounts and timing of those

11

payments" and "memorialized them" in a "chart."  AC ¶ 32.  The Court accepts that allegation as true for purposes of this motion.[5]  Although the addendum is not expressly labeled as Exhibit A, in light of the lack of disagreement at this stage that the schedule represents the parties' contemporaneous agreement on pacing as contemplated in the SRA, the addended pacing schedule is appropriate for the Court to consider as a part of the contract at the motion to dismiss stage.  *See* 11 Williston on Contracts § 30:25 (4th ed. 2025) ("Generally, all writings which are part of the same transaction are interpreted together."); *GE Funding Cap. Mkt. Servs., Inc. v. Neb. Inv. Fin. Auth.*, 2016 WL 4784002,  at *4 (S.D.N.Y. Sept. 14, 2016) ("Extrinsic matters such as letters and other instruments may be construed as a part of a contract where they are referred to therein or annexed thereto, or where it appears they were intended to be a part of the contract.") (quoting *Hallmark Synthetics Corp. v. Sumitomo Shoji N.Y., Inc.*, 275 N.Y.S.2d 587, 590 (1st Dep't 1966)).

### A.    Obligation to Pay

Screenvision argues first that the premise of MediaCap's understanding of the SRA is flawed and "Screenvision has no obligation to pay MediaCap in the absence of sales generated by MediaCap."  Dkt. No. 22 at 9.  That is, it argues that reading the contract as a whole, there was no breach as a matter of law because MediaCap has not alleged that it generated any sales of the advertising inventory it was granted the rights to, and is therefore entitled to no payments under the SRA.  MediaCap responds that the SRA contemplates payments regardless of whether it generated any sales or whether any sales occurred at all.  Dkt. No. 32 at 11.

---

[5] Although this addendum is signed only by Screenvision, MediaCap signed a similar pacing schedule laying out the Set-Off values that matches that provided by Screenvision in the same time frame.  *See* Dkt. Nos. 18-3, 184.  In light of MediaCap's own allegation that there was an "agreement" as to this schedule, AC ¶ 32, and that Screenvision does not argue the addendum is invalid, it is properly considered as annexed to the agreement.

Screenvision can succeed on its motion to dismiss only if "the contract's unambiguous language confirms as a matter of law that no breach has occurred." *Titus v. UMG Recordings, Inc.*, 2023 WL 8039622, at *9 (S.D.N.Y. Nov. 20, 2023) (citing *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 153 (S.D.N.Y. 2007)).  "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016); *see Zero Carbon Holdings, LLC v. Aspiration Partners, Inc.*, 2023 WL 8936386, at *5 (S.D.N.Y. Dec. 27, 2023).  "Parties may not create ambiguity merely by advocating for conflicting interpretations of their agreement," and ambiguity is not created "because one party attached a particular, subjective meaning to a term that differs from the term's plain meaning." *Thompson v. Mun. Credit Union*, 2022 WL 2717303, at *4 (S.D.N.Y. July 13, 2022).  Additionally, "[c]ourts should construe a contract so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract." *Helmsley-Spear, Inc. v. N.Y. Blood Ctr., Inc.*, 687 N.Y.S.2d 353, 357 (1st Dep't 1999); *see also Trireme Energy Holdings, Inc. v. RWE Renewables Americas, LLC*, 757 F. Supp. 3d 445, 486 (S.D.N.Y. 2024) (courts are to "construe the contract 'so as to give full meaning and effect to all of its provisions.'") (quoting *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014)).  "In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions" *Locus Techs. v. Honeywell Int'l Inc.*, 632 F. Supp. 3d 341, 353 (S.D.N.Y. 2022) (internal citations and quotations omitted) (applying New York and Delaware law).  "Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."

13

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004).

The parties' disagreement turns on the meaning to be ascribed to the definition of Net Media Cost as used in Sections 4(b) and 4(c) of the Agreement.  Under the SRA, Screenvision assumed the obligation to sell the SV Sales Inventory for an amount "no less than the Net Media Cost."  SRA § 4(b).  That term is defined in the SRA to mean the "actual media cost as determined at the rate negotiated and/or ordered by Screenvision's customers on contracts/orders with Screenvision for advertising placements relating to SV Sales Inventory."  *Id.* § 4(b)(i).  The SRA continues that the "Net Media Cost for the SV Sales Inventory is agreed to be an amount that is no less than the value stated for the Company Inventory that was assigned to Screenvision as SV Inventory."  *Id.* § 4(b)(ii).  In turn, the payment the SRA contemplates between Screenvision and MediaCap turns on the Net Media Cost.  Screenvision agreed to pay MediaCap the "greater amount" of either (i) "the Net Media Cost of the SV Sales Inventory resold by Screenvision during a particular broadcast quarter," or (ii) an amount "equal to the Net Media Cost of the SV Sales Inventory assigned to Screenvision for use in the prior quarter, less the Screenvision Commission."  *Id.* § 4(c).

Screenvision argues that the contract is unambiguous, in that Section 4(b)(i) defines Net Media Cost as contingent upon sales, and that Section 4(b)(ii) "carries that definition forward" in defining the lower bound of what that value is, assuming the existence of sales.  Dkt. No. 33 at 5.  Screenvision continues that because either of the two contemplated payment values in Section 4(c) incorporate the definition of Net Media Cost, and Net Media Cost turns on sales, without sales there is no payment.  Dkt. No. 33 at 5.  On the other hand, MediaCap argues that the Section 4(b)(ii)'s language that the Net Media Cost be "no less than" the value "assigned to

14

Screenvision" means that regardless of any sales, the Net Media Cost cannot be lower than $25,400,000—the value assigned to Screenvision by MediaCap. Dkt. No. 32 at 14. And as to the payments contemplated in Section 4(c), MediaCap points to the language in Section 4(c)(ii) that payment shall be the "amount that is equal to the Net Media Cost assigned to Screenvision for use in the prior quarter, less the Screenvision Commission," which it argues does not turn on the occurrence of any sales. *Id.* The Court takes each provision in turn.

Beginning with the term "Net Media Cost," Section 4(b) of the SRA defines the term in two parts. First, Section 4(b)(i) defines Net Media Cost as the "actual media cost as determined by the rate negotiated and/or ordered by Screenvision's customers on contracts/orders." Thus, that first definition contemplates a Net Media Cost calculated off of actual sales that are made. It presumes that there are sales. However, Section 4(b)(ii) then clarifies that Net Media Cost "is agreed to be an amount that is no less than the value stated for the Company Inventory that was assigned to Screenvision as SV Inventory." SRA § 3(b)(ii). It is reasonable to conclude that such provision does not require sales. Together, the two provisions can be read to set both a primary method of calculation but also a floor under which payments will not drop. If the rates negotiated and paid for the inventory are ultimately higher than the value of the assigned inventory, that higher value is Net Media Cost. But regardless the Net Media Cost will not fall below the value of the assigned inventory—here, $24,500,000.[6] In other words, MediaCap

---

[6] Screenvision's argument that Section 3(b)(ii)'s use of the term "SV Inventory" rather than "SV Sales Inventory" means that the inventory was not "assigned to Screenvision" by MediaCap as SV Inventory and thus is not the Net Media Cost is without merit at this stage. Dkt. No. 33 at 5. First, this argument is raised for the first time in Screenvision's reply brief and therefore cannot be considered. *See ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F. 3d 85, 97 n.12 (2d Cir. 2007) ("We decline to consider an argument raised for the first time in a reply brief.") Second, "SV Inventory" is not a term that is defined in the SRA and it is reasonable to assume from context that the term refers to SV Sales Inventory. Screenvision offers no other understanding of the term. *See Nippon Fire & Marine Ins. Co. v. M/V Tourcoing*, 979 F. Supp.

15

elected to engage Screenvision as its sales representative to sell the Further Company Inventory, the rights to which it had been granted by Screenvision—an assignment that Screenvision could not unreasonably refuse to accept.  Once Screenvision accepted that assignment, it was required to sell the Further Company Inventory for its assigned value of $24,500,000 (a portion of which was to be retained as commission and a portion of which was to be used to pay down MediaCap's debt to Screenvision).  Under that reasonable reading, the risk of loss (*i.e.*, that there would be no sales) fell on Screenvision.

Screenvision argues to the contrary that Section 4(b)(i) is the only definition of Net Media Cost, and that Section 4(b)(ii) merely carries that definition forward such that the defined term, as defined by actual media cost (sales) will not fall below the assigned value.  There is some force to that argument.  But it is not unambiguously correct.  First, Net Media Cost is not first defined and then applied in subsections (i) and (ii).  Rather, subsections 4(b)(i) and 4(b)(ii) each appear to contain alternate methods of calculating Net Media Cost, "[f]or the purposes of this Agreement."  Additionally, Screenvision's reading could lead to absurd results.  Under that reading, if Screenvision sold a portion of the Further Company Inventory for even one cent, because there was *some* "actual media cost," subsection (ii) would be triggered and the Net Media Cost would equal the value of the assigned Company Inventory, $25,400,000.  But if no sales were made, the Net Media Cost would be zero.  There is no reason to believe that the parties contemplated such absurd results.

This understanding of Net Media Cost is confirmed too by Section 4(c) of the SRA, which contemplates two different ways of calculating a payment due to MediaCap from

---

206, 213 (S.D.N.Y. 1997).  Without any proposed meaning or meaning evident in the SRA itself, Screenvision thus has not shown that term to be unambiguous or contrary to MediaCap's understanding.

16

Screenvision. Section 4(c)(i) is clear that one amount that might be owed to MediaCap (if it is the "greater" amount) is the "Net Media Cost of the SV Sales Inventory *resold* by Screenvision." SRA § 4(c)(i) (emphasis added). That provision clearly requires the occurrence of sales in order to calculate the payment due. On the other hand, 4(c)(ii) clarifies if that value is *less* than the value of the "Net Media Cost of the SV Sales Inventory assigned to Screenvision for use in the prior quarter, less the Screenvision Commission," this second method is used to calculate the payment owed. *Id.* § 4(c)(ii). Considering that section as a whole, 4(c)(ii) is best understood on the record before the court at the motion to dismiss stage as describing a payment that is not contingent upon MediaCap assisting in the execution of any sales of the Further Company Inventory. If Section 4(c)(ii) did, like (c)(i), require sales, subsection (c)(ii) would have no independent meaning and all payment under the SRA would be based on what was "resold", despite the fact that "resold" appears nowhere in Section 4(c)(ii).

Screenvision does not offer a compelling understanding of the contractual terms that would give independent meaning to Section 3(b)(ii) or 3(c)(ii). Nor are its arguments that MediaCap's understanding would be inconsistent with the rest of the contract so persuasive as to render that term unambiguous in their favor. First, Screenvision argues that the language that the parties must undertake Joint Efforts to "sell/use" the inventory confirms that sales are required under the contract for any payment to be due to MediaCap. But that is not the only reasonable reading of Section 2(a) of the SRA, which imposes an obligation on MediaCap to assist in the making of such sales (or for some other "use" of the inventory), but does not make such sales a condition precedent to MediaCap's performance under the SRA. Next, Section 4(d) of the SRA explains that where a payment is due to MediaCap, as defined in the prior sections, a percentage of that value will be set off against the $10,150,000 owed by MediaCap to Screenvision from its

17

purchase of the Initial Inventory. SRA § 4(d). Nothing in the subsection requires sales for that setoff to apply—it requires only that payments flow from Screenvision to MediaCap, such that a portion of those payments would be used to pay down the existing amount owed. The set-off obligation would be satisfied regardless of whether the payments are made to MediaCap on the basis of subsection 4(c)(i) or 4(c)(ii). Section 5(b) refers to the obligation of Screenvision to supply MediaCap with "sales reports" upon request, and states that "until [Screenvision] pays [MediaCap] for the SV Sales Inventory that it will keep all funds that are paid by Screenvision's customers for same for [MediaCap's] benefit." SRA § 5(b). That the SRA contemplates how the parties should conduct themselves in the event there are sales does not imply by necessity that there can be payments *only* if there are sales. Screenvision also argues that this understanding of the SRA is in tension with the "illustrative" example of a payment in Section 4(c), because in that example there is $2,000,000 in SV Sales Inventory sold, resulting in a payment amount to MediaCap of $1,500,000. But the SRA is explicit that the example given is for "illustrative purposes only." SRA § 4(c).

The SRA's provision of a "Screenvision Commission" is more difficult to harmonize with the payment scheme as alleged by MediaCap. It is defined as "25% of Net Media Cost in connection with its services as [MediaCap's] sales representatives." SRA § 3(b). Commonly understood, a commission is a "payment, or a payment, for services or work done as an agent in a commercial transaction, typically a set percentage of the value involved." Oxford English Dictionary, "Commission" (3d ed.); *see Mazzola v. Cty. Of Suffolk*, 533 N.Y.S.2d 297, 297 (2d Dep't 1988) ("it is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."). If a payment is due from Screenvision to MediaCap despite the lack of any sales under the SRA, it is difficult to imagine

18

what "commercial transaction" Screenvision took as MediaCap's "agent" that resulted in the payment of a commission to Screenvision.  The answer may be, simply, that where there is no sale, Screenvision is not entitled to a commission.  That the parties agreed to a pacing schedule including commission payments seemingly regardless of sales does not alter the definition of commission in Section 4(b).  It is also possible that the definition of the Screenvision Commission in the SRA, unlike the dictionary definition, does not turn on the occurrence of a commercial transaction.  It is due "in connection with" Screenvision's services as MediaCap's "sales representative," and thus does not expressly apply only where a sale is made.  The commission could therefore be calculated as a percentage of the "value stated for the Company Inventory that was assigned to Screenvision," and not just based on actual sales made.  *Id.*  Either way, the fact that the SRA contemplates a commission does not in turn imply that payment is contingent upon sales, and does not clarify that the contract unambiguously requires payment only upon execution of such sales.

Screenvision argues as well that the payment theory advanced by MediaCap would make the contract commercially unreasonable.  "Under New York law, the Court cannot interpret a contract so as to reach such a result."  *Atlas Partners, LLC v. STMicroelectronics, Intern. N.V.*, 2015 WL 4940126, at *12 (S.D.N.Y. Aug. 10, 2015) (citing *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (1st Dep't 2010)); *see Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015) ("It is black-letter law that courts must reject interpretations of agreements that are commercially unreasonable or illogical.").

There is some force to Screenvision's argument but not enough to establish Screenvision's right to dismissal.  Screenvision argues that under MediaCap's interpretation it would be required to pay $9 million to MediaCap "simply because MediaCap 'assigned' Further

19

Company Inventory back to Screenvision" and even if the inventory was not sold. Dkt. No. 22 at 16. By the same token, it also is true that under MediaCap's interpretation, over $10 million in debt MediaCap owes to Screenvision also is offset even absent sales. The result does not make sense, as MediaCap appears to be getting something for nothing; it has not helped Screenvision make sales. But Screenvision's interpretation of the SRA does not make much more sense, if any. Under Screenvision's interpretation, for every $1,000 in inventory sold by it as agent for MediaCap, MediaCap would receive $750—$375 in cash and $375 as a set off of the amount previously due Screenvision. But the inventory that Screenvision would have sold is its own inventory, the right to which it granted to MediaCap. On its face, the SRA appears to give MediaCap the right to sell the inventory to its own clients; it is not required to use Screenvision as an agent or to have Screenvision sell the inventory to its clients. And Screenvision's right to a Sales Commission arises only if it makes efforts in connection with the sale of the Further Company Inventory. The negative implication is that if Screenvision makes no such efforts then it is not entitled to a commission. It is not clear why Screenvision would have granted MediaCap the rights to $25,400,000 in advertising inventory and then agreed, if MediaCap assigned that inventory right back to Screenvision, to pay MediaCap 75 cents on the dollar. But it appears to have done so. And viewed from that vantage, MediaCap's argument is not so odd. It engaged Screenvision to sell advertising inventory when it did not have to do so and Screenvision—not MediaCap—should bear the risk of loss. If there were no sales, Screenvision would not receive a commission. [7]

---

[7] In reaching this decision, the Court does not rely on MediaCap's argument that Screenvision ratified its duty to pay through subsequent conduct. The cases cited by MediaCap to support their ratification argument are inapposite and address a situation where a party that entered a contract under duress may nevertheless later ratify it through conduct. *See* Dkt. No. 32 at 18 (citing *Allen v. Riese Org., Inc.*, 965 N.Y.S.2d 437, 517 (1st Dep't 2013) ("Assuming arguendo

### B.      Joint Efforts

Screenvision also argues that MediaCap's breach of contract claims must fail because MediaCap has not adequately alleged its own performance under the contract.  To establish a cause of action for breach of contract, the moving party must allege "the party's own performance under the contract."  *Radiation Oncology Servs. of Central N.Y., P.C. v. Our Lady of Lourdes Memorial Hosp.*, 200 N.Y.S.3d 521, 526 (3d Dep't 2023).  The SRA states that MediaCap "shall be deemed to have an obligation to engage in Joint Efforts with Screenvision to sell/use the Further Company Inventory."  SRA § 2(a).  Those Joint Efforts are in turn defined to include those means used collectively to "enhance Screenvision's sales conversion efforts," and include the right of MediaCap to "work with Screenvision's senior management to create new or otherwise grow, maintain, or otherwise enhance Screenvision's relationships with new or existing advertisers and agencies, to sell, transfer, assign or otherwise dispose of its right to Company Inventory and/or Production Services to Company Clients."  *Id.* at 2–3.

Screenvision argues that MediaCap has not adequately alleged the provision of such joint efforts.  Dkt. No. 22 at 9.  MediaCap alleges that it "fully complied with all of its obligations under the SRA, including its Joint Efforts obligations (as defined in the SRA)."  AC ¶ 34.  It continues that "[a]mong other things, MediaCap participated in lead-generating meetings with Screenvision, prepared presentations, media plans, and competitor analyses, conducted research, and leveraged its broad contact base to generate leads."  *Id.* ¶ 35.  Moreover, MediaCap alleges that many of the Joint Efforts it undertook "were performed by MediaCap's Consultant, Damon Peirson," who is "recognized as a leader in the media industry."  *Id.* ¶ 36.  "Over his career, he planned and executed media buying decisions for some of the nation's most prominent

---

that issues of fact exist as to duress and overreaching, plaintiffs are nevertheless barred from challenging the releases on those grounds because they ratified the releases.")).

21

advertisers, totaling in excess of a billion dollars," such that "Screenvision was certainly aware of Mr. Peirson's reputation and influence when it entered into the SRA." *Id.*  MediaCap alleges also that "[o]n March 18, 2025, and at various other times during the term of the SRA, Mr. Patilla expressed his appreciation to MediaCap for its Joint Efforts to date." *Id.* ¶ 37.  Plaintiff points also to an email from Screenvision to MediaCap on June 30, 2025, which confirms MediaCap's provision of consulting services.  *See* Dkt. No. 18-8 at 2–3 ("Damon and I have received positive feedback," and "I remain optimistic we will each benefit from sales later in the year.").

In a breach of contract action, "a plaintiff may allege their own performance under a contract generally." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 617 (S.D.N.Y. 2024) (collecting cases).  That is because "[t]he function of a complaint under Rule 8 is to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Where the plaintiff has alleged the existence of an agreement, identified the obligations of the defendant, plead facts to establish non-performance, and pleaded her own performance generally, the plaintiff has satisfied Rule 8."  *Id.*  "The defendant, who is the counterparty to the agreement, is in a position to know those obligations and to defend on the grounds that the plaintiff has not satisfied them."  *Id.*  Accordingly, MediaCap's allegations are plainly sufficient.

Screenvision also argues that MediaCap's allegations of performance under the SRA go only toward the "strategic consulting services" that MediaCap would provide "[a]t Screenvision's request" per Section 3(a) of the SRA and thus cannot fulfill the obligation under Section 2(a) to engage in Joint Efforts.  *See* Dkt. No. 33 at 2 ("its allegations of performance of one duty do not plead another.").  The SRA does not draw a line between the provision of Joint

Efforts and the provision of the stated consulting services, and at this stage there is therefore no reason to believe that conduct that satisfies the one could not also satisfy the other. Joint Efforts as defined expressly includes MediaCap working with Screenvision to "create," "grow," and "maintain" relationships with advertisers, SRA at 2, and the consulting services include advice on "offerings, selling strategies, and/or other marketing strategies, pricing strategies, and materials associated," *id.* § 3(a). Not only are those definitions closely aligned, but the SRA provision on the consulting services expressly notes that they must be provided "in connection with the Joint Efforts." *Id.* At the motion to dismiss stage, the cited allegations are sufficient to show that "it duly performed all duties under the contract." *Vibes Int'l Inc., SAL v. Iconix Brand Grp., Inc.*, 2020 WL 3051768, at *4 (S.D.N.Y. June 8, 2020).

## C.    Damages

Screenvision next argues that MediaCap has failed to state a breach of contract claim because it has not alleged resulting damages. For its breach of contract claim MediaCap seeks the value of the two payments that Screenvision was supposed to make, but did not, in July and October of 2025, totaling $1,500,000. AC ¶¶ 53–61. "The general rule for measuring damages for a breach of contract has long been settled. It is the amount necessary to put a plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92 (1984). Screenvision argues that MediaCap has not stated a claim for any damages, as its allegations "foreclose any damages." Dkt. No. 22 at 17. Screenvision argues that because MediaCap owes Screenvision "(1) $125,000 in upfront cash and $10,025,000 in set-offs for the Initial Company Inventory . . . and (2) an additional $6,350,000 in commissions on the Further Company Inventory," the total of $16.5 million that MediaCap owes Screenvision is $7.475 million greater than the $9,025,000 that MediaCap argues in this suit that it is owed. *Id.* at 18.

23

Screenvision's argument on damages pre-supposes the merits of its argument on Net Media Cost, which the Court has now rejected. According to the pacing schedule agreed by the parties, Screenvision was assigned and was to sell a total of $5,000,000 of the Further Company Inventory by October 1, 2025. Dkt. No. 18-2 at 3. The SRA defines Net Media Cost as "no less than the value stated for the Company Inventory that was assigned to Screenvision as SV Inventory." SRA § 4(b)(ii). Up to October 1, 2025, that assigned value, and thus the Net Media Cost, is $5,000,000. The chart included in the SRA addendum clarifies that from the first $2,000,000 in inventory sales MediaCap would be paid only $375,000 after subtracting out the SV commission retained ($500,000) and the set-off for the money owed for the Initial Company Inventory ($1,125,000). *Id.* For the inventory sale of $3,000,000 to be made by October 1, 2025, MediaCap would receive $1,125,000 after subtracting out $750,000 in SV Commission and $1,125,000 in set-off. *Id.* The damages alleged by MediaCap therefore already include deductions on account of the money it owes to Screenvision.[8]

It is true that MediaCap admits that it owes Screenvision $10,150,000 for the Initial Inventory. But the addendum to the SRA states that MediaCap's "payments to Screenvision for the Initial Company Inventory will be made to Screenvision through the limited set-off process set forth in the Agreement, and no other claims for payment in connection with the Initial Company Inventory, or the Agreement may be made by Screenvision against [MediaCap]." Dkt. No. 18-2 § 2. The parties agreed that there is not a freestanding obligation of MediaCap to pay Screenvision for the Initial Inventory at any time that Screenvision decides that it has come due,

---

[8] Although several of the values contemplated in the addendum do not comport with Section 4(d) of the SRA (which limits the set off to "a maximum of 50%" of the pacing media cost remaining after payment of the Screenvision Commission), neither party argues that these discrepancies support their understanding of the SRA's terms.

as that value would be paid solely through the set-off mechanism in the SRA.  As explained above, those set-offs account in large part for the reduced value owed to MediaCap versus the Net Media Cost.

Screenvision's motion to dismiss Count I of the AC is denied.

## II.    Anticipatory Breach

MediaCap has also sued for anticipatory breach, through which it seeks the balance of the remaining payments that have not yet come due.  AC ¶¶ 62–65.  "The doctrine of anticipatory repudiation permits the non-breaching party to elect to state a claim for breach of contract at the time of repudiation, instead of at the time for performance." *28th Highline Assocs., LLC v. Roache*, 2019 WL 917208, at *9 (S.D.N.Y. Feb. 25, 2019).  "It is therefore dependent on the existence of a material breach of contract." *Id.* (citing *DiFolco v. MSNBC Cable LLC*, 831 F. Supp. 2d 634, 641 (S.D.N.Y. 2011)); *see SOL-MM III LLC v. JPMorgan Chase Bank, N.A.*, 2025 WL 936414, at *24 (S.D.N.Y. Mar. 27, 2025) ("Courts have described anticipatory breach—also known as breach by anticipatory repudiation—as 'a doctrine of accelerated ripeness because it gives the plaintiff the option to have the law treat the promise to breach as a breach itself.'") (quoting *Berardi v. Berardi*, 2024 WL 1269902, at *3 (2d Cir. Mar. 26, 2024) (summary order)).

"An anticipatory breach of contract by promisor is a repudiation of a contractual duty before the time fixed in the contract for performance has arrived." *Princes Point LLC v. Muss Dev. LLC*, 87 N.E.3d 121, 124 (N.Y. 2017) (quoting Corbin on Contracts § 54.1 (2017)).  "An anticipatory breach of a contract—also known as an anticipatory repudiation—'can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'" *Id.* (quoting *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659

25

(N.Y. 1998)).  To state a claim for anticipatory breach, the moving party must allege a "final communication" by the defendant "to forgo its obligations" under the contract.  *Jacobs Private Equity, LLC v. 450 Park LLC*, 803 N.Y.S.2d 14, 15 (1st Dep't 2005).  "Case law recognizes that demanding an extracontractual term as a not-previously-agreed-upon condition precedent to performing under a contract may constitute an anticipatory repudiation, particularly where the plaintiff rejects such a term and treats the contract as breached."  *Exchange Listing, LLC v. Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 146 (S.D.N.Y. 2023) (citing New York cases).

MediaCap alleges that on June 30, 2025, a representative of Screenvision informed MediaCap that because "no creditable new sales have come through MediaCap," "there isn't a basis for Medicap to ask Screenvision for a payment under the Agreement."  AC ¶ 46; *see* Dkt. No. 18-8.  Accordingly, Screeenvision did not make the payment envisioned by the pacing schedule on July 1, 2025, and on July 10 informed MediaCap again that Screenvision did not owe it any payments.  AC ¶¶ 48–49.  Screenvision continued in that communication that in fact "MediaCap owes money to Screenvision for the Initial Company Inventory."  *Id.* ¶ 49.  On October 1, 2025, Screenvision did not make the second payment envisioned under the pacing schedule.  *Id.* ¶ 50.

These allegations are sufficient to state a claim that Screenvision made "positive and unequivocal" its position that it did not need to make any payments to MediaCap in the absence of sales generated through MediaCap.  *See Exch. Listing, LLC*, 661 F. Supp. 3d at 145; *DiFolco*, 831 F. Supp. 2d at 642 ("The law is clear, however, that whether Plaintiff repudiated the contract is based on an objective, not a subjective, standard.").  The alleged statements are "'overt communications of intention not to perform' agreed upon obligations."  *Howard v. Bioworks,*

*Inc.*, 921 N.Y.S.2d 776, 777 (4th Dep't 2011) (quoting *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978)).

Screenvision argues that MediaCap's anticipatory breach claim must nevertheless fail because "[g]enerally, the doctrine of anticipatory breach has no application to contracts for the periodic payment of money, and recovery is limited to payments due as of the commencement of the action." *Apostolou v. Mutual of Omaha Ins. Co.*, 421 N.Y.S.2d 600, 601 (2d Dep't 1979). That is, "the doctrine of anticipatory breach is not applied with regard to contracts for the payment of money in fixed monthly installments." *Franklin Sco. Fed. Sav. & Loan Ass'n v. Far-Pap Corp.*, 393 N.Y.S.2d 782, 783 (2d Dep't 1977). This argument oversimplifies the law. The principle on which Screenvision relies applies only to unilateral contracts, where one party has fully performed and the other is required to make payments at installments for that completed performance. *See NMC Residual Ownership LLC v. U.S. Bank Nat. Ass'n*, 60 N.Y.S.3d 110, 116 (1st Dep't 2017) ("The anticipatory breach claim fails because the complaint merely alleges that the defendant had a unilateral obligation to pay money."). Examples of such unilateral obligations to pay include a "simple arrangement for payment of a fixed sum such as an annuity," *Long Island R. Co. v. Northville Indus. Corp.*, 362 N.E.2d 558, 566 (N.Y. 1977), a mortgage with installments due each month, *Franklin*, 393 N.Y.S.2d at 783, or distributions from a trust, *NMC*, 60 N.Y.S.3d at 112–13; *see also AboveNet Comm'cns, Inc. v. A&D Data Corp.*, 2010 WL 235005, at *5 (S.D.N.Y. Jan. 19, 2010) (listing cases in which the principle has been applied, including "real estate lease cases," "mortgage contracts," "accident and health insurance payments," "royalty payments," and "leases, insurance contracts and annuities.").

To the contrary, the doctrine of anticipatory breach is properly applied to "bilateral contracts embodying some material interdependent conditions and obligations." *Nat'l Union*

27

*Fire Ins. Co. of Pittsburgh v. Antony*, 1988 WL 49040, at \*6 (S.D.N.Y. May 9, 1988) (quoting

*Reprosystem, B.V. v. SCM Corp.*, 630 F. Supp. 1099, 1101 (S.D.N.Y. 1986)).  "The fact that only

money is owed by the repudiating party to the non-repudiating party is not determinative," and

"the focus must be on whether the non-repudiating party has any obligation from which it needs

to be relieved."  *SOL-MM III LLC*, 2025 WL 936414, at \*25 (quoting *Long Island R. Co.*, 362

N.E.2d at 565).  In plain English, anticipatory breach is available to a party that seeks clarity as

to whether it is required to continue its own performance under a contract even where the

contractual counterparty has clearly signaled it will no longer perform.  "For the doctrine [of

anticipatory breach] to apply, there must be 'some dependency of performances.'"  *Long Island

R. Co.*, 362 N.E.2d at 563 (quoting Restatement of Contracts § 318, Cmt. e).

MediaCap has not alleged the breach of a simple "contract[] for the payment of money

only," for which anticipatory breach is not available.  *Long Island R. Co.*, 362 N.E.2d at 565.

Instead, MediaCap has alleged a contract in which "there existed some dependency of

obligation."  *Id*.  Here, "MediaCap is obligated to future performance—i.e., obligation to engage

in Joint Efforts.  The SRA is therefore a bilateral contract requiring mutual and interdependent

condition and obligations, not a contract for the 'periodic payment of money' only."  Dkt. No. 32

at 23.[9]  "Put differently, "[i]n order to recover in a future action," MediaCap would be required

to "show that it is still in a condition to perform."  *Long Island R. Co.*, 362 N.E.2d at 565.  The

SRA is thus an agreement that is "bilateral in nature, rather than unilateral."  *Howard*, 921

---

[9] Screenvision argues in its reply brief that MediaCap cannot argue it has an obligation to provide Joint Efforts where it alleged in the AC that "Screenvision's obligations to make quarterly payments to MediaCap was absolute and unconditional."  Dkt. No. 33 at 9 (quoting AC ¶ 31).  MediaCap does not, by its use of that language, disclaim its obligation to engage in Joint Efforts, which it pleads in the AC.  *See* AC ¶¶ 24–25.  Read in context, the "absolute and unconditional" language in the AC is meant to counter Screenvision's understanding that the SRA requires payment only where there are sales resulting from those joint efforts.

N.Y.S.2d at 777; *see SOL-MM III LLC*, 2025 WL 936414, at *25 (finding that the moving party's obligation not to sue any "Shared Guarantor" so long as the loan was outstanding created a bilateral contract under which anticipatory breach was available).

Screenvision's motion to dismiss Count II is denied.

### III.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, MediaCap has alleged that Screenvision violated the covenant of good faith and fair dealing implied into the contract.  It does so in the alternative, "[i]f it is determined that Screenvision's payments to MediaCap were contingent on sales." AC ¶ 71.  "It is black letter law that a complaint may plead in the alternative." *Walker v. Carter*, 2014 WL 4363956, at *2 (S.D.N.Y. Sept. 3, 2014) (quoting *Astroworks v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 (S.D.N.Y. 2003)); *see* Fed. R. Civ. P. 8(d)(2).  "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)).  "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983).  Accordingly, "[n]o obligation can be implied . . . which would be inconsistent with other terms of the agreement of the parties." *Id.*

MediaCap alleges that this implied covenant was breached because Screenvision did not "properly allocate[e] its sales to MediaCap, thus frustrating its own performance under the SRA." AC ¶ 71.  "In fact," the AC continues, "Mr. Partilla admitted to Mr. Dolan that Screenvision had not properly allocated its sales to MediaCap." *Id.* ¶ 72.  Assuming in the

29

alternative that payment is contingent on sales, and accepting that allegation as true, Screenvision's actions would have the "effect of destroying or injuring the right of" MediaCap to "receive the fruits of the contract." *State St. Bank & Tr. Co.*, 747 N.Y.S.2d at 31.  That is if Screenvision had made sales that should have been allocated to MediaCap, and thus result in payment to MediaCap, but instead declined to properly allocate them, MediaCap would not get the benefit for which they contracted.  *See VR Optics, LLC v. Peloton Interactive, Inc.*, 2017 WL 3600427, at *4 (S.D.N.Y. Aug. 18, 2017) ("conduct that while technically not constituting a breach of contract, nevertheless deprives the plaintiff of the benefit of its bargain," can constitute a breach of the implied covenant); *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (the covenant requires that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations.")

In response, Screenvision argues that MediaCap's allegations do not state a claim for breach of the implied covenant of good faith and fair dealing because it was at Screenvision's sole discretion under the SRA to decide who to sell the inventory to.  Dkt. No. 22 at 23 (citing SRA § 4(b)).  Under the SRA, Screenvision retains the exclusive discretion to determine which third parties are eligible to purchase the SV Sales Inventory, how they should make that purchase, how the purchase is delivered, and how it is invoiced.  SRA § 4(b).  However, a party cannot "automatically relieve itself of the obligation to exercise that contractual right in good faith by the simple expedient of adding the language 'sole discretion,' if the failure to act in good faith would render the contract illusory."  *S. Telecom Inc. v. ThreeSixty Brands Grp.,* LLC, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021).  "No magic words can *ipso facto* and without review of the contract as a whole relieve a contracting party of that obligation."  *Id.*  If, as MediaCap

30

alleges, Screenvision was executing sales that should have been attributed to MediaCap but nevertheless withholding payment, that would evidently render the contractual provisions for payment upon such sales illusory.  The same would be true if Screenvision decided, in its discretion, to make no sales of the Further Company Inventory at all in an effort to avoid making any payments to MediaCap.  That too would frustrate the purpose of the parties as outlined in the SRA.  That action would "deprive[] [MediaCap] of the fruits of its agreement and would render its contractual promises illusory."  *Id.* at 509; *see Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980).

Screenvision also argues that because MediaCap "does not plead that MediaCap brought any sales to Screenvision, it also lacks a plausible claim that Screenvision failed to allocate such sales to MediaCap in good faith."  Dkt. No. 22 at 23.  MediaCap resists this conclusion on its allegation that "Mr. Partilla admitted to Mr. Dolan that Screenvision had not properly allocated its sales to MediaCap."  AC ¶ 72.  At the motion to dismiss stage, the facts alleged are "taken as true," and the court must "draw all reasonable inferences in favor of the plaintiff."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (first quoting *Twombly*, 550 U.S. at 555–56, then quoting *Litwin v. Blackstone Grp., LP*, 634 F.3d 706, 715 (2d Cir. 2011)).  The question is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  MediaCap's allegation is not a mere "threadbare recital[] of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678.  Rather, the allegation that Mr. Partilla admitted to Dolan that Screenvision misallocated its sales adequately supports the allegation that Screenvision did not properly allocate its sales to MediaCap.  AC ¶¶ 71–72.

Screenvision also argues that MediaCap has failed to plead damages with respect to the breach of the covenant of good faith and fair dealing claim. That argument is without merit. MediaCap pleads this claim as an alternative claim if the contract reflects that it was entitled to payments only where there was a creditable sale. And MediaCap alleges that there were in fact creditable sales, as admitted by the principal of Screenvision, that were not attributed to MediaCap. Under Screenvision's own understanding of the SRA, any such sale would entitle MediaCap to a payment, less any commission and set-off value. That MediaCap does not allege a specific value of damages does not doom its allegation. AC ¶ 73.

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion to dismiss is granted as to Count III of the AC, which is dismissed with prejudice. The motion to dismiss is denied as to Counts I, II, and IV. The stay on discovery is lifted. The Parties are directed to submit an updated Case Management Plan on April 22, 2026.

The Clerk of Court is respectfully directed to close Dkt. Nos. 13 and 22.

SO ORDERED.

Dated: April 15, 2026
      New York, New York
                                    LEWIS J. LIMAN
                         United States District Judge